

**ORDERED in the Southern District of Florida on December 9, 2025.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

_Tagged opinion_

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

IN RE:                                                    Chapter 7 Case

INDUSTRIAL HUMAN CAPITAL, INC.,          Case No.: 23-11014-LMI

      Debtor.
_____/

ROBERT A. ANGUEIRA, as Chapter 7 Trustee of
the Bankruptcy Estate of INDUSTRIAL HUMAN
CAPITAL, INC.,

      Plaintiff,

v.                                                       Adv. Pro. No.: 25-01050-LMI

HRT FINANCIAL LP,

      Defendant.
_____/

<u>**ORDER DENYING MOTION TO DISMISS**</u>

This matter came before the Court for hearing on June 23, 2025 (the "Hearing") upon the *Motion to Dismiss* (the "Motion to Dismiss") (ECF #7) filed by Defendant, HRT Financial LP ("Defendant"), the *Response in Opposition* (the "Response") (ECF #12) filed by Robert A. Angueira ("Plaintiff" or "Trustee"), as Chapter 7 trustee of the bankruptcy estate of Industrial Human Capital, Inc. (the "Debtor", or, when referred to pre-petition, "IHC"), and Defendant's *Reply in Support of Motion to Dismiss* (the "Reply") (ECF #14). Having considered the foregoing, the Trustee's *Complaint* (ECF #1) ("Complaint")[1], the Trustee's *Notice of Filing Corrected Exhibit B to the Complaint* (ECF #16), the arguments of counsel and the applicable law, for the reasons set forth below, the Motion to Dismiss is denied.

## SUMMARY OF DISPUTE

The issue presented in the Complaint for which the Motion to Dismiss seeks resolution is whether and to what extent, pre-petition, IHC had an interest in funds held in a trust account such that the Trustee can seek to recover some or all of those trust account funds which were disbursed pre-petition to certain shareholders in a stock redemption. The answer lies in the interplay between Delaware law, the trust agreement that governed the trust account, and other documents including IHC's charter and various filings with the U.S. Securities and Exchange Commission (the "SEC").

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334(b) and 28 U.S.C. §157. Jurisdiction of the bankruptcy court is governed by 28 U.S.C. §1334, which provides, in relevant part, that "the district courts shall have original but not exclusive jurisdiction of all civil

---

[1] The Trustee filed four identical complaints against HRT Financial LP (Case No. 25-01050-LMI), MMCAP International, Inc. SPC (Case No. 25-01052-LMI), Wolverine Asset Management LLC (Case No. 25-01054-LMI), and Sea Otter Advisors LLC (Case No. 25-01049-LMI) (collectively the "Complaints"). The four defendants filed omnibus Motions to Dismiss. The Court has chosen to enter four separate orders but the orders are identical other than information specific to each defendant.

proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §1334(b). Under 28 U.S.C. §157, "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. §157(b). This matter is a core proceeding under 28 U.S.C. §157(b). To the extent that any of the claims in the Complaint are not "core" claims, the Court has "related to" jurisdiction, at very least, because all of the state law claims "could conceivably have an effect on the estate being administered in bankruptcy." *Tufts v. Hay*, 977 F.3d 1204, 1209 (11th Cir. 2020) (internal quotation marks and citation omitted).

## THE STANDARD FOR REVIEW

Federal Rule of Bankruptcy Procedure 7012 provides that Federal Rule of Civil Procedure 12(b)(6) applies to bankruptcy proceedings. Fed. R. Bankr. P. 7012(b). Under Rule 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555 (citation omitted).

Whether the allegations in a complaint are sufficient to state a claim for relief is a purely legal question. *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291, 1308 n.11 (11th Cir. 2015) (quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997)). When

considering a motion to dismiss under Rule 12(b)(6), a court accepts "the allegations in the complaint as true and [construes] them in the light most favorable to the plaintiff." *Watts v. Joggers Run Property Owners Ass'n, Inc.*, 133 F.4th 1032, 1038-39 (11th Cir. 2025). "Thus, a motion to dismiss based upon a failure to state a claim tests the sufficiency and plausibility of the complaint, taking those well-pleaded allegations as true, in the light most favorable to the plaintiff, with all inferences draw in the plaintiff's favor. *In re Estrategias en Valores, S.A.*, 628 B.R. 722, 728 (Bankr. S.D. Fla. 2021) (citing *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002)). Here, the allegations in the Trustee's Complaint are accepted as true for purposes of ruling on the Motion to Dismiss.

The Defendant asserts that the Trustee failed to state a claim upon which relief may be granted because the funds in question were not an interest of the Debtor in property. The Court disagrees and, accordingly, denies the Motion to Dismiss.

## BACKGROUND[2]

IHC was formed as a special purpose acquisition company ("SPAC"), also known as a blank check company. A simplified explanation of a SPAC is that a company is formed for the sole purpose of acquiring, usually through merger, another company. In addition to funds contributed to fund the cost of forming the SPAC, the SPAC then raises funds from investors which are placed in trust until the target is identified. Generally, there is a time limit to find the target; after expiration of that time, the funds are subject to return by the original investors.

IHC was formed as a Delaware corporation on February 16, 2021 through the filing of its Certificate of Incorporation with the Delaware Secretary of State. The operative charter during

---

[2] These facts are those alleged in the Complaint and do not constitute any actual factual findings of the Court. However, most of these facts do not appear to be disputed by the Defendant, only the legal consequences associated with the factual allegations.

the relevant time period is the *First Amendment to the Amended and Restated Certificate of Incorporation of Industrial Human Capital, Inc.* dated October 14, 2022, and the *Amended and Restated Certificate of Incorporation of Industrial Human Capital, Inc.* dated October 19, 2021 (collectively, the "Charter").[3] After IHC was formed, it conducted an initial public offering (the "IPO") in October of 2021. On October 14, 2021, IHC filed with the SEC an Amendment to the Form S-1 Registration Statement Under the Securities Act of 1933 which included its Preliminary Prospectus. The Debtor's final Prospectus was filed on October 19, 2021 (the "Prospectus").[4]

As disclosed in the Prospectus, a majority of the gross proceeds (the "Sale Proceeds") of the IPO of the shares in IHC were to be deposited in a bank account (the "Trust Account") with Continental Stock Transfer & Trust Company ("Continental") serving as trustee.

On October 19, 2021, IHC conducted its IPO and $116,725,000 raised in the IPO was deposited into the Trust Account.[5] On that same date, IHC entered into the Investment Management Trust Agreement (the "Trust Agreement") with Continental. The Trust Agreement provides for Continental to manage, supervise, and administer the Trust Account. Although the parties to the Trust Agreement are IHC and Continental, the named beneficiaries of the Trust Agreement are IHC and the purchasers of the shares issued through the IPO, identified as the "Public Stockholders."

Beginning in August 2022, vendors hired by IHC began sending demand letters to IHC because IHC failed to timely pay invoices for services rendered. In October of 2022, as reported in IHC's Form 8-K filed with the SEC, approximately 98% of the Public Stockholders elected to

---

[3] ECF #16 is the *Trustee's Notice of Filing Corrected Exhibit B to Complaint*, attached to which is the Charter.
[4] The Prospectus is attached to the Trustee's Complaint as Exhibit A (ECF #1-1).
[5] At the Hearing, the Defendant's counsel sought to differentiate the initial shares issued in IHC when it was formed from the shares issued as a consequence of the IPO, arguing that the IPO shares were "temporary equity," while the initial shares are "traditional corporate stock issued to raise working capital." The Court finds this to be a distinction without a difference for purposes of this decision since the law applicable to the issue presented here does not distinguish between these shares as equity.

redeem their shares. In the same Form 8-K, following the statement regarding the redemption election by the shareholders, IHC cautioned that if some redeeming shareholders do not cancel their redemption requests, IHC may dissolve and liquidate "subject to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law."

IHC's general counsel and corporate secretary, Mark Absher, sought the advice of both outside Delaware counsel and outside securities counsel, requesting guidance regarding IHC's obligations to its creditors under Delaware law.  The correspondence addressed Mark Absher's understanding that redeeming the shares without paying IHC's creditors appeared to be a violation of Delaware law. IHC's outside Delaware counsel agreed that that appeared to be correct.

Subsequent to this letter exchange, on November 11, 2022, IHC's chief executive officer, Scott Absher, signed and issued a letter to Continental (the "Termination Letter") to effectuate the stockholder redemption authorizing liquidation of the funds in the Trust Account and the redemption payment to the Public Stockholders – approximately $117 million – less  $200,000 for payment of franchise taxes, which were to be transferred to IHC, and $91,227.28 reserved for and paid to Continental.

In December 2022, IHC transferred a total of $117,669,574.01 in order to redeem its outstanding shares from its shareholders. IHC's shareholders received $10.23213687 per each share that they owned of IHC. The Defendant owned 45,131 shares of IHC and, accordingly, received the Transfer in the amount of $461,786.57. (the "Transfer"). Creditors (other than one insider creditor who received a preference that this Court has avoided in a separate adversary proceeding)[6] received nothing.

---

[6] *See Order Granting Trustee's Motion for Partial Summary Judgment against Defendant ShiftPixy, Inc. to Avoid and Recover Preferential Transfers* (Case No. 23-01257-LMI, ECF #86). This order was not appealed and has long been final.

On February 7, 2023, three creditors of IHC filed an involuntary Chapter 7 bankruptcy petition against IHC. IHC did not contest the involuntary petition. On March 3, 2023, the Court entered the Order for Relief and the Trustee was thereafter appointed.

The Trustee filed this adversary proceeding on February 28, 2025. In the six-count Complaint, the Trustee seeks to avoid and recover the Transfer. The Trustee attached 28 exhibits to his Complaint to support the allegations that the funds transferred to the Defendant in the Transfer were an interest of the Debtor in property; that the Debtor intended to hinder, delay and defraud its creditors in violation of Delaware law and the Debtor's own Charter and Prospectus; that the Transfer was made in exchange for no value at a time when the Debtor had been sued and was not paying its debts; and that the Transfer rendered the Debtor insolvent.

## ANALYSIS

There is no dispute that what constitutes property of the estate is very broad. *See* 11 U.S.C. §541(a)(1); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983). The phrase "an interest of the debtor in property" (§ 548(a)(1)) and "interests of the debtor in property" (§ 541(a)) are coextensive. *See Begier v. I.R.S.*, 496 U.S. 53, 59 n.3 (1990); *see also In re Clink*, 643 B.R. 522, 525 (Bankr. D. Mass. 2022) (citing *Begier v. I.R.S.*) ("An 'interest of the debtor in property' is not defined in the Bankruptcy Code. The Supreme Court has found that the phrase 'an interest of the debtor in property,' for purposes of avoidance actions, is coterminous with 'property of the estate' as defined by § 541(a)(1), 'which includes all legal or equitable interests of the debtor in property as of the commencement of the case' wherever located and by whomever held.").

Under the plain language of the Bankruptcy Code, bankruptcy courts have found that the term "property of the estate" has the "broadest possible meaning." *In re Vital Pharm.*, 655 B.R. 374, 380 (Bankr. S.D. Fla. 2023). This broad interpretation has allowed courts to determine that

7

"property of the estate" includes "hard assets such as real property, vehicles, equipment, inventory, and the like" as well as intangible assets such as causes of action, intellectual property rights, goodwill, an FCC license, and stock appreciation rights. *Id.* at 381; *see also Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) ("It would be hard to imagine language that would be more encompassing than this broad definition . . . ***every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541.***") (emphasis added) (internal citation and quotation marks omitted).

The Trustee has asserted that prior to the IPO, IHC had an interest in its own shares of stock, which it then conveyed to its shareholders in exchange for the proceeds from the IPO that were placed into the Trust Account. This is not disputed. The proceeds from the sale of something that was indisputably an interest of the Debtor in property – its own shares – are property in which the Debtor has an interest.[7] *See* 11 U.S.C. §541(a)(6) (proceeds of property of the estate constitute property of the estate); *see e.g., In re Pitt Penn Holding Co., Inc.*, 2011 WL 4352373, at *5 (Bankr. D. Del. 2011) (noting that "the argument that [a] corporation lacks an interest in the stock itself at the time of issuance blinks economic reality" (internal quotation and citation omitted)).[8]

Thus, the funds in the Trust Account, the source of which is not disputed, were the proceeds of the sale of IHC's stock, regardless of the conditions under which they were held, and therefore property of the Debtor and property of the estate.

---

[7] Although not dispositive of this issue, the Court notes that the Complaint states that the funds in the Trust Account were identified as assets of the Debtor on the Debtor's financial statements filed with the SEC, including, *inter alia*, the Debtor's Balance Sheet contained in Forms 10-Q filed with the SEC on May 12, 2022 (for the period ending March 31, 2022) and August 12, 2022 (for the period ending June 30, 2022).

[8] *See also Geltzer v. Brizinova, et al. (In re Brizinova, et al.)*, 592 B.R. 442, 462 (Bankr. E.D.N.Y. 2018) ("It is beyond doubt that where a debtor owns the shares of a corporation, a sale of those shares for cash or other consideration results in 'proceeds.' In such a transaction, all that has occurred is that property of the estate has changed from one form – shares of stock – to another form – cash or other consideration."); *In re Wiczek-Spaulding*, 223 B.R. 538, 541 (Bankr. D. Minn. 1998) (stock obtained from the exercise of stock options constituting estate property is itself estate property, as are cash proceeds generated from the sale of stock), *rev'd in part on other grounds*, 256 B.R. 618 (D. Minn. 2001).

Nonethless, the Defendant asserts that the Debtor's interest in the Sale Proceeds was, at best, "bare legal title" because the Sale Proceeds were placed into the Trust Account subject to the terms of the Trust Agreement. The Defendant argues that under the terms of the Trust Agreement if IHC failed to complete a business combination, "with no exceptions, that the Trust Funds [would] be promptly returned to Public Stockholders in connection with the redemption and cancellation of their shares." Thus, the Defendant argues, the Court must grant the Motion to Dismiss, because, as a matter of law, the proceeds the Trustee seeks to recover are not property of the estate.

The Trustee counters that, regardless of the Defendant's interpretation of the provisions of the Trust Agreement, the unambiguous terms of IHC's Prospectus made clear to shareholders that if IHC did not complete its business combination within the required period of time, IHC must comply with Delaware law and pay creditor claims before redeeming shareholders. The Trustee also points to IHC's Charter, the terms of the Trust Agreement itself, including the Termination Letter, a form of which is an exhibit to the Trust Agreement, to underscore his argument that, because funds in the Trust Account had to be used, if necessary,[9] to pay creditors, that the law recognizes the Debtor's interest in those funds for a use other than completing a business combination.

The Court first turns to the provisions of the documents at issue, all of which are attached as exhibits to the Complaint or to the Motion to Dismiss, and therefore, all of which are considered for purposes of resolving the Motion to Dismiss. *See Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000) (internal citation and quotation omitted) ("When considering a motion

---

[9] The Court does not need to address whether, if the Debtor had had sufficient funds other than those in the Trust Account to pay creditors, the nature of the Debtor's interest in the Trust Account would be limited in a manner not present here.

to dismiss, all facts set forth in the plaintiff's complaint are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto."); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010) (holding that a court may consider a document attached to a motion to dismiss if it is central to the plaintiff's claims and its authenticity is not disputed).[10]

The Prospectus provided in several places that if IHC failed to complete its business combination within the required period of time, IHC was required to comply with Delaware law and pay creditor claims before redeeming the shares of its common stock issued to its shareholders and before dissolving:

> If we are unable to complete our initial business combination within such 12-month period[11] … we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account …, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, **subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law**.

Prospectus (emphasis added).

The Prospectus also stated that the claims of creditors <u>would</u> have higher priority than the claims of shareholders and that creditor claims <u>must</u> be paid before any payment to shareholders:

> **The proceeds deposited in the trust account could, however, become subject to the claims of our creditors which would have higher priority than the claims of our public stockholders**. We cannot assure you that the actual per-share redemption amount received by stockholders will not be substantially less than $10.15. **Under Section 281(b) of the DGCL, our plan of dissolution must provide for all claims against us to be paid in full or make provision for payments to be made in full, as applicable, if there are sufficient assets. These claims must be paid or provided for before we make any distribution of our**

---

[10] The Trust Agreement was not attached as an exhibit to the Complaint, but was attached to the Motion to Dismiss. In the Response, the Trustee did not object to the Trust Agreement being included in the record.

[11] The period to complete IHC's business combination was later extended to 18 months.

**remaining assets to our stockholders**. While we intend to pay such amounts, if
any, we cannot assure you that we will have funds sufficient to pay or provide for
all creditors' claims.

Prospectus (emphasis added).

The Prospectus further warned shareholders of the consequences of paying shareholders

before creditors:

If, after we distribute the proceeds in the trust account to our public stockholders,
we file a bankruptcy petition or an involuntary bankruptcy petition is filed against
us that is not dismissed, any distributions received by stockholders could be viewed
under applicable debtor/creditor and/or bankruptcy laws as either a "preferential
transfer" or a "fraudulent conveyance." **As a result, a bankruptcy court could
seek to recover some or all amounts received by our stockholders.**

Prospectus (emphasis added).

IHC's Charter also recognizes that Delaware law requires that creditors must be paid before

either a redemption or a dissolution[12] can occur. *See* Charter, (ECF #16).

Section SIXTH of IHC's Charter begins by stating that it applies "during the period

commencing upon the filing of this Amended and Restated Certificate of Incorporation and

terminating upon the consummation of any 'Business Combination.'" Charter, (ECF #16).

Section SIXTH (E) of IHC's Charter requires that IHC comply with the Delaware General

Corporate Law ("DGCL") and pay creditors before redeeming shareholders (subsection (ii)) and

before dissolving and liquidating the balance of IHC's net assets to its shareholders (subsection

(iii)):

In the event that the Corporation does not consummate a Business Combination by
[18] months from the consummation of the IPO … the Corporation shall (i) cease
all operations except for the purposes of winding up, (ii) as promptly as reasonably
possible but not more than ten business days thereafter redeem 100% of the IPO
Shares for cash for a redemption price per share as described below (which
redemption will completely extinguish such holders' rights as stockholders,
including the right to receive further liquidation distributions, if any), and (iii) as

---

[12] To the extent that whether and when dissolution has occurred is relevant, it is disputed and cannot be resolved on a
motion to dismiss.

promptly as reasonably possible following such redemption, subject to approval of the Corporation's then stockholders and subject to the requirements of the DGCL, including the adoption of a resolution by the Board of Directors pursuant to Section 275(a) of the DGCL finding the dissolution of the Corporation advisable and the provision of such notices as are required by said Section 275(a) of the DGCL, dissolve and liquidate the balance of the Corporation's net assets to its remaining stockholders, as part of the Corporation's plan of dissolution and liquidation, **subject (in the case of (ii) and (iii) above) to the Corporation's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law**. In such event, the per share redemption price shall be equal to the Trust Fund plus any interest earned on the funds held in the Trust Fund and not previously released to the Corporation and not necessary to pay its taxes divided by the total number of IPO Shares then outstanding.[13]

Charter, (ECF #16) (emphasis added).

Further, Section SIXTH (F) of the Charter provides that shareholders can receive funds held in the Trust Account only if there is a business combination (which did not occur) or as provided in Section SIXTH (E), which section explicitly requires IHC to comply with Delaware law and pay creditors before redeeming shareholders or dissolving:

A holder of IPO Shares shall only be entitled to receive distributions from the Trust Fund in the event (i) he, she or it demands conversion of his, her or its shares in accordance with paragraph C above [concerning a successful business combination] **or (ii) that the Corporation has not consummated a Business Combination by the Termination Date as described in paragraph [SIXTH] E above. In no other circumstances shall a holder of IPO Shares have any right or interest of any kind in or to the Trust Fund.**

---

[13] Defendant asserted in its Reply that the last sentence of Section SIXTH (E), which provides that "in such event" the per share redemption shall be calculated as set forth in that sentence, requires the entire balance of the Trust Account (*i.e.*, the Trust Fund) plus interest to be paid to shareholders. *See* Reply at p. 4 (emphasis in original): "Section SIXTH (E) expressly provides that Public Stockholders are entitled to 'the Trust [Account] plus any interest earned on the funds held in the Trust [Account] and not previously released to the Corporation and not necessary to pay its taxes,' with *no provision for payments to creditors out of the Trust Account*." Defendant's interpretation of Section SIXTH (E) ignores a portion of the quoted section. Subsection (ii) of Section SIXTH (E), which addresses redemptions, provides that the Debtor shall "redeem 100% of the IPO Shares for cash **for a redemption price per share as described below,**" and Subsection (ii) is expressly subject to the requirements of Delaware law regarding the payment of creditor claims: "**subject (in the case of (ii) and (iii) above) to the Corporation's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law.**" *See* Charter, (ECF #16) (emphasis added).

Charter, (ECF #16) (emphasis added), The Defendant admits that a business combination never occurred.

The Defendant asserts in its Motion to Dismiss that the repeated admonitions in IHC's Prospectus are "boilerplate risk disclosures", and that the terms of the Trust Agreement, which the Defendant argues make clear its right to the funds if there is no timely business combination, trumps any creditor claims and takes precedence over any language in the Charter to the contrary.

So the Court will now turn to the Trust Agreement.

The Trust Agreement provides in Section 1(i) that Continental was required to "complete the liquidation of the Trust Account and distribute the Property in the Trust Account . . . only as directed in the Termination Letter and the other documents referred to therein." (ECF #12-1). The Trust Agreement attaches as exhibits four separate forms of termination letters, one of which, Exhibit D, is the termination letter "to be used to redeem shares of Common Stock from Public Stockholders . . . if the Company has not consummated an initial Business Combination within such time as is described in the Charter." Each termination letter form has a description in the "Re:" line: Exhibit A and Exhibit B are titled "Trust Account - Termination Letter"; Exhibit C is titled "Trust Account - Withdrawal Instruction"; and Exhibit D is titled "Trust Account - Stockholder Redemption Withdrawal Instruction." The November 11, 2022 Termination Letter from IHC to Continental is a combination of Exhibit B and Exhibit D, but most significant is the "Re:" line, which is specifically titled "Trust Account – Stockholder Redemption Withdrawal Instruction."

The Termination Letter expressly provided, in relevant part, that "You [Continental] agree to be the Paying Agent of record and, in your separate capacity as Paying Agent, agree to distribute said funds directly to the Company's Public Stockholders in accordance with the terms of the Trust

Agreement and the [Debtor's] Charter." (ECF #1-19). And in fact, the Defendant has admitted, both in the Motion to Dismiss, and at the Hearing on the Motion to Dismiss, that the return of the funds was a stock redemption.

Delaware Law is clear that creditors must be paid before shareholders. *See* DGCL §160; *TCV VI, L.P. v. TradingScreen Inc.*, 2015 WL 1598045, at *4 (Del. Ch. 2015) (noting that §160 protects corporate creditors and that "while preferred stock possesses characteristics of both debt and equity, the rights of all stockholders, including preferred, are subordinate to the rights of the creditors."); *SV Inv. Partners LLC v. ThoughtWorks Inc.*, 7 A.3d 973, 982 (Del. Ch. 2010) (noting § 160 provides protection to creditors "by prohibiting transactions that would redistribute to stockholders assets that were part of what nineteenth and early twentieth century common law jurists deemed a permanent base of financing upon which creditors were presumed to rely when extending credit."); *Cooper v. Eastern Horse & Mule Co.*, 110 A. 666, 668 (Del. Ch. 1920) (determining that a stockholder was "not entitled to receive any of the assets of the company when they are insufficient to pay in full such other creditors.").

The provisions of Delaware Law governing redemption rights under DGCL § 160 cannot be altered through a contractual agreement. *See Continental Investors Fund LLC v. TradingScreen Inc.*, 2021 WL 3120860, at *17 (Del. Ch. 2021) (determining that "the hornbook principal of contract law that a party who contends that its contractual obligation was excused bears the burden of proving the grounds for excusal" did not apply to "mandatory redemption provisions because of the junior position that equity holders occupy in the capital structure" and noting that "Both the DGCL and the common law impose restrictions on redemption rights that other contract claimants do not face."). "[A]n equity investor is not like other contractual claimants: The equity investor purchased equity, which is presumptively permanent capital." *Id.* at *18.

14

The Court disagrees with the Defendant's characterization of the multiple warnings in the Prospectus as "boilerplate risk disclosures."[14] Although the Prospectus was not an agreement between IHC and the investors who became Public Stockholders, it operated as the informational document from which their investment decisions were made.

The Debtor's Charter is equally clear and unambiguous that creditor claims had to be paid before a redemption as explained, *supra*, and that shareholders have no "right or interest of any kind in or to the Trust Fund" unless creditors are paid. Charter, (ECF #16).

It is also significant that the Public Stockholders were not parties to the Trust Agreement. The Trust Agreement is a contract between IHC and Continental.  The "contract" between the Public Stockholders and IHC is the Charter, which governs, with the Delaware statute, the rights and responsibilities of IHC as the corporation to its shareholders, and the limitations and conditions of those rights and responsibilities.  To argue that an agreement to which the Defendant was not a party somehow supersedes the agreement from which all of Defendant's rights as a shareholder stem, is to ignore reality.  The Trust Agreement is one of the documents, along with the Debtor's Charter and Prospectus/Registration Statement, that govern the Debtor's obligations and procedures, subject to Delaware law. *See Ruffalo v. TransTech Serv. Partners, Inc.*, 2010 WL 3307487, at *2 (Del. Ch. 2010) ("Collectively, the Charter, Registration Statement, and Trust Agreement specify the procedures that TransTech [the SPAC] was to follow between the time of the IPO and the time it either consummated a business combination or was dissolved and liquidated.").

---

[14] Indeed, the last page of IHC's Prospectus provides: "You should rely only on the information contained in this prospectus. We have not, and the underwriters have not, authorized anyone to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it."

The Court will now turn to the case law cited by the parties. The Defendant relies on multiple cases that hold that funds in trust accounts were not property of the estate in those cases. But each case cited by the Defendant in support of this proposition is distinguishable from the instant case. No case cited by the Defendant involves the proceeds from a sale of a debtor's own stock. No case involves a debtor that was expressly named a beneficiary of the trust at issue. And no case involves funds that were held in a bank account of a party which served as trustee for the debtor, in an account titled as such.

The Defendant cites to *Begier v. IRS*, in which a debtor collected taxes from customers or withheld taxes from the debtor's employees and put the funds in the debtor's accounts. 496 U.S. 53 (1990). The Supreme Court held, and the law is clear, that the debtor never had any right or interest in the withheld funds, but was instead simply facilitating payment of taxes from its customers and employees to the IRS. *Id.* In this case, the funds in the Trust Account were being held for the benefit of the Debtor and the Public Stockholders, and each beneficiary was subject to the terms and conditions of the Trust Agreement.

The Defendant also cites to *T&B Scottdale Contractors, Inc. v. U.S.*, a case where a contractor had set up an account for its subcontractor (the debtor) to pay the subcontractor's materialmen under a contract between the contractor and subcontractor. 866 F.2d 1372 (11th Cir. 1989). The contractor maintained control of the account and generally only deposited funds into the account when an amount was due to be paid, and only the contractor ever deposited money into the account. *See id.* Under these circumstances the court held that the subcontractor never had an interest in any of the funds. *See id.* The Debtor in this case exchanged its own stock for the funds transferred into the Trust Account. IHC had control of the account because Continental could only transfer funds as directed by a letter from IHC.

16

The Defendant also relies on *City Nat'l Bank of Miami v. Gen. Coffee Corp.*, which was a case determining ownership of the *res* of a constructive trust to prevent unjust enrichment by one party at the expense of another as a result of fraud. 828 F.2d 699 (11th Cir. 1987). The Trust Account is distinguishable from a constructive trust generally, and the debtor in *General Coffee* only held bare legal title to the property while only the trust beneficiary held the equitable ownership interest. *See id.* at 706. The Defendant's reliance on *Napleton v. Stettin (In re Rothstein Rosenfeldt Adler, P.A.)*, 2010 WL 2301240 (Bankr. S.D. Fla. 2010) is also inapposite because that case involved a law firm bankruptcy and an attorney trust account which the parties agreed the funds were not property of the bankruptcy estate. These cases are distinguishable because in this case, the *Debtor* is a named beneficiary of the Trust Account.

The Defendant's reliance on *In re MultiPlan Corp. Stockholders Litig.*, 268 A.3d 784 (Del. Ch. 2022) is also misplaced. In that case, the court was not considering the ownership of funds in a SPAC account, but rather, it was considering whether a claim brought by stockholders after a successful business combination was a direct or derivative claim from a post-merger company. The ownership of funds was not at issue and that case is not instructive here.

Both parties cite to *Ruffalo*, 2010 WL 3307487. In *Ruffalo*, the plaintiffs argued that a provision in the SPAC's trust agreement capped the amount of trust funds the SPAC could pay its creditors. *Id*. at *11. The court disagreed, interpreting the provision by looking not only at the trust agreement as a whole, but also to the charter and registration statement/prospectus. *Id*. at *12. The court held the amount of trust funds that could be used to pay creditors was not capped, pointing to a different section of the trust agreement that referenced payment to creditors, the registration statement that warned investors that their rights to the funds "may be jeopardized by [the SPAC's]

creditor claims," and the charter's statement that the SPAC was entitled to withdraw funds from the account as specified by the registration statement. *Id*. at *12–14.

The Defendant relies on an unreported decision, *In re Financial Strategies Acq. Corp.*, 2024 WL 5517098 (Bankr. E.D. Tex. 2024), where, in a one and a half page order  the court denied a SPAC debtor's motion to compel a bank to release funds into its debtor-in-possession account in order to comply with 11 U.S.C. §345. The one and a half page order contains little analysis and provides no basis (citations to documents or applicable law) for its cursory statement that the debtor had no interest in the principal amount of the funds held in that trust account. And in any event, the *Financial Strategies* order is not binding on this Court.

The Defendant also relies heavily on *Zama Capital Master Fund, LP v. 26 Capital Acq. Corp.*, No. 2024-0370-JTL (Del. Ch. Apr. 19, 2024) (Transcript of Oral Argument, pp. 3-6), an unreported, non-bankruptcy case with no section 541 analysis and no written analysis, but the comments made at a hearing, which are reflected in a transcript attached as Exhibit 2 to Defendant's Motion to Dismiss. However, *Zama* supports the Trustee's position that no lawful redemption can occur under Delaware law when the redeeming company would be rendered insolvent thereby. In *Zama*, Vice Chancellor Laster noted that the trustee agreement at issue "contemplate[s] a distribution without a redemption" and that the termination letter contemplated a distribution.  That was an important observation to the Vice Chancellor who made very clear that a redemption "come[s] under Section 160".  The Vice Chancellor also looked at the charter and noted "there's nothing in this charter that I've seen that lets the company take the stock from its stockholders in exchange for cash when it's insolvent."  Thus, while the Vice Chancellor noted that Continental was only bound by the terms of the trust agreement, that was a separate issue from when, and under what circumstances shares of a corporation could be redeemed.  That issue,

according to the Vice Chancellor, required consideration not only of the trust agreement, but also the corporate charter, and Delaware law.  Similarly, in this case, there is no dispute that the Transfer is a redemption not a distribution, and therefore the propriety of the Transfer is dictated by Delaware law and the Charter, in addition to applicable provisions of the Trust Agreement.

Having reviewed the Complaint, the documents that are relevant to this decision, and the case law cited by the parties, the Court finds that the Complaint adequately pleads that the funds were interests of the Debtor in property because it alleges sufficient and undisputed facts that the Debtor was a named beneficiary of the Trust Account. By written contract (the Trust Agreement), the parties have agreed that the Debtor, alongside the Public Stockholders, has a beneficial interest in the trust funds, which must be accepted as true at this stage. The Complaint also adequately pleads that the funds were proceeds of property of the estate because the Debtor has an interest in its own stock and sold that stock  in exchange for the trust funds.

Additionally, the Complaint adequately alleges that the Transfer violated Delaware law and the Debtor's Charter.  The Trust Agreement states that if there is no business combination, liquidation shall follow the procedures set forth in the Termination Letter, which in turn states that the funds shall be distributed not only according to the Trust Agreement but also the Charter. The Debtor's Charter–the foundational and controlling document of the Debtor–also contained language stating that redemption was conditioned on the Debtor's obligation to comply with Delaware law and provide for creditor claims. In *Ruffalo*, the court interpreted a trust agreement provision in light of all the relevant documents to find that an unlimited amount of the trust funds were subject to claims of the debtor's creditors. 2010 WL 3307487, at *12–14. Therefore, the provisions of the Trust Agreement in light of the Termination Letter, Prospectus, and Charter support the Trustee's allegations in the Complaint.

19

## CONCLUSION

Although the Defendant has argued that a ruling in Plaintiff's favor will "turn the well-worn SPAC structure on its head," nothing Defendant has provided supports any such argument. Moreover, the SPAC structure, as well as any other corporate financing structures, are dictated by the laws that inform their creation and operation.  For the foregoing reasons, the Court determines that the Complaint is sufficiently pleaded to survive a motion to dismiss.  The allegations in the Complaint that the funds in the Trust Account were an interest of the Debtor in property are not contradicted by the relevant documents nor applicable law. Accordingly, the Motion to Dismiss is **DENIED**.

# # #

Copy furnished to:
Paul Steven Singerman, Esq.
singerman@bergersingerman.com
Berger Singerman LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

*(Attorney Singerman is directed to serve this order upon all non-registered users or registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*